**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SEAN JENKINS** | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:23-cv-05115-JMG |
| | : | |
| **CIOCCA MANAGEMENT, INC.** | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                          **January 9, 2025**

## I.    OVERVIEW

Plaintiff Sean Jenkins ("Plaintiff") was employed by Defendant Ciocca Management, Inc. ("Defendant" or "Ciocca") from 2013 until 2023. Defendant operates numerous car dealerships; Plaintiff was hired as a used car manager and worked his way up the corporate ladder to become the general manager of Defendant's Allentown Subaru dealership ("the dealership"). Plaintiff's case contains allegations of sexual harassment and hostile work environment, gender and race discrimination, and Title VII retaliation. Plaintiff has raised many genuine issues of fact that require determination by a jury. Accordingly, the Court will deny almost all of Defendant's Motion for Summary Judgment and will allow this case to proceed to trial; however, because Plaintiff is unable to put forth direct evidence of racial discrimination, he is foreclosed from presenting his Section 1981 claim under the mixed-motive theory.

## II.    BACKGROUND

Plaintiff began working for Defendant in 2013 as a used car manager at Defendant's Subaru dealership in Allentown, Pennsylvania. *See* Def.'s Statement of Undisp. Facts ("ECF No. 19-3") at ¶ 4. Three years later, he was promoted to become general sales manager of the dealership. *See*

*id.* at ¶ 5. While general sales manager, he reported to Mr. Kyle Egge—the dealership's general manager. *See id.* Then, in 2019, when Mr. Egge was promoted to become Defendant's Regional Vice President, Plaintiff was promoted again and became the general manager of the dealership. *Id.* at ¶ 6.

This dispute centers around interactions between Plaintiff and Ms. Summer McGlaughlin, an employee of the dealership. Ms. McGlaughlin met Plaintiff in 2018 and had asked him about job opportunities at the dealership. *See id.* at ¶ 7. She was eventually hired as a delivery coordinator. *See id.* The parties agree that, in 2019, Ms. McGlaughlin began to send "explicit, sexually charged" messages to Plaintiff through the app Instagram. *Id.* at ¶ 8. Plaintiff did not know that he was receiving these messages until sometime in late 2020 or early 2021. *See id.* at ¶ 9; *see also* Dep. of Jenkins ("ECF No. 19-5") at 28:6-29:3. In March of 2021, Plaintiff showed Mr. Egge these messages in March of 2021. *See* ECF No. 19-3 at ¶ 9. In response, Mr. Egge allegedly told Plaintiff that "he wanted nothing to do with the situation." *Id.* at ¶ 11.

In 2023, Plaintiff learned that rumors of an affair between him and Ms. McGlaughlin were swirling around the dealership. *See id.* at ¶ 13. In response to learning of these rumors, Plaintiff went to Defendant's Human Resources Director, Priscilla DiFeo. *See id.* at ¶¶ 12, 14. Ms. DiFeo launched an investigation into Plaintiff's allegations. *See id.* ¶ 18.

After the investigation was completed, Ms. DiFeo and Mr. Joseph Maher, Defendant's Chief Operating Officer, met with Plaintiff. *See id.* at ¶ 19. At this meeting, Plaintiff was informed that he would no longer be employed as the general manager of the dealership. *See id.* at ¶ 20. Defendant claims that they tried to engage Plaintiff in a discussion as to whether he could remain employed at Ciocca in another capacity, *See id.* at ¶¶ 20, but that Plaintiff refused this discussion. *See id.* at ¶ 21. Plaintiff, on the other hand, claims there was a discussion as to him staying

employed with Defendant, but Defendant would not engage in a conversation as to whether Plaintiff's financial and compensatory situation would change in a new position. *See* Pl.'s Resp. Statement of Undisputed Material Facts ("ECF No. 20-1") at ¶¶ 20-21, 36, 50. Plaintiff also testified in his deposition that during this meeting Ms. DiFeo told him that he should have handled the situation with Ms. McGlaughlin by "tak[ing] her out for a drink." *See id.* at ¶ 37; *see also* ECF No. 19-5 at 61:9-13. Later, in Defendant's appeal of Plaintiff's unemployment compensation claim, Defendant reported that Plaintiff was terminated for unspecified policy violations. *See* ECF No. 20-1 at ¶ 63; Pl.'s Ex. D ("ECF No. 20-6").

Plaintiff denies that he ever had a sexual relationship with Ms. McGlaughlin. *See* ECF No. 20-1 at ¶ 32. Moreover, he claims that he "never spoke with Ms. McGlaughlin on WhatsApp or had any video calls with Ms. McGlaughlin on any platform." *Id.* at ¶ 35. In the course of Defendant's HR Investigation, Plaintiff claims that Ms. DiFeo interviewed five individuals, including Plaintiff and Ms. McGlaughlin. *See id.* at ¶ 42. Mr. Egge was not among the five individuals who were interviewed. *See id.* Also, Plaintiff claims that the investigation could not confirm any relationship between Plaintiff and Ms. McGlaughlin, nor could it confirm that he ever responded to her messages. *See id.* at ¶¶ 49, 51.

Plaintiff and Ms. McGlaughlin made accusations against each other. *See id.* at ¶ 48. In her deposition, Ms. DiFeo indicated that she had doubts as to Ms. McGlaughlin's truthfulness. *See id.* at ¶ 61; *see also* Dep. of DiFeo ("ECF No. 20-5") at 89:4-8. According to Plaintiff, the Defendant's HR Investigation found that Ms. McGlaughlin was not harassed by Plaintiff. *See* ECF 20-1 at ¶ 56. The investigation also concluded that Ms. McGlaughlin was not in violation of Defendant's harassment or sexting policies. *See* ECF 20-1 at ¶¶ 59-60. Plaintiff claims that the investigation resulted in no adverse employment action or discipline for Ms. McGlaughlin. *See id.* at ¶¶ 54-55.

Ms. McGlaughlin's employment ended in 2023 "in conjunction with settlement of claims against" Defendant. *Id.* at ¶ 41.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). A fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (quoting *Robinson v. PPG Indus. Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019); *see also InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003) ("When analyzing the evidence under this summary judgment standard, a court is not to weigh the evidence or make credibility determinations; these tasks are left for the fact-finder." (internal quotation marks omitted)). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

## IV.    DISCUSSION & ANALYSIS

Plaintiff's Complaint contains five claims: (1) Hostile Work Environment under Title VII, (2) Gender Discrimination under Title VII, (3) Race and Color Discrimination under Title VII, (4) Retaliation under Title VII, and (5) Race Discrimination under 42 U.S.C. § 1981. Defendant has moved for summary judgment on each claim; the Court will address each in turn.

### i.    Title VII – Hostile Work Environment

#### a.  Elements

First, is Plaintiff's Title VII claim alleging a hostile work environment. "A plaintiff may [ ] establish than an employer violated Title VII by proving that sexual harassment created a hostile work environment." *Huston v. Proctor & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citing *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999)). "To establish a hostile work environment claim against an employer, a plaintiff must prove the following: (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Huston*, 568 F.3d at 104.

In the context of a hostile work environment claim, "Title VII is violated only 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to … create an abusive working environment.'" *Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 155 (3d Cir. 2016) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The existence of a hostile work environment is determined by looking at the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 642 F. App'x at 155 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). The Court is mindful that "Title VII is not intended as a 'general civility code,' and requires that 'conduct must be extreme' to constitute the kind of 'change in the terms and conditions of employment' the statute was intended to target." *Id.* (quoting *Faragher*, 524 U.S. at 788).

### b. Respondeat Superior Liability Standard

Defendant's briefing focuses on the fifth element of the hostile workplace claim—the existence of respondeat superior liability[1]; Defendant argues that Plaintiff's claim fails as a matter of law because he was Ms. McGlaughlin's supervisor, and therefore cannot bring a sexual harassment claim under Title VII. *See* ECF No. 19 at 5-6. It is true that the method of analysis of a hostile work environment claim turns on the workplace relationship between the alleged perpetrator and the alleged victim. *See Huston*, 568 F.3d at 104 ("The basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's

---

[1] Defendant does not make any argument as to any other elements of this claim, so the Court will not address the elements that were not argued. *See Smith v. McKinney*, Case No. 2:22-cv-02983-JDW, 2023 WL 3543531, at *10 (E.D. Pa. Oct. 6, 2023) ("Because Defendant's don't argue about the other elements of the claim, I do not have to address them."). Of course, Plaintiff is still required to prove these elements at trial.

supervisor or merely a coworker.").

First, when a supervisor harasses a subordinate ("supervisor-on-subordinate"), an employer may be strictly liable. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) ("If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."). In this scenario, without a tangible employment action, an employer can raise an affirmative defense that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807). A person qualifies as a supervisor "for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.*

Second, is the scenario where a coworker harasses another coworker ("coworker-on-coworker"). "When the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable. Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint, or alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston*, 568 F.3d at 104. "[A]n employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment." *Id.* at 104-05. "An employer knew or should have known about workplace sexual harassment if *management-level* employees had actual or constructive knowledge about the existence of a sexually hostile environment." *Id.* at 105 (emphasis included). "[M]anagement level employees have constructive notice of a hostile work environment when 'an employee provides management

level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer.'" *Id.*

Third, several district courts have recognized yet another lane of assessing liability in cases, such as this one, where a subordinate allegedly sexually harasses his or her supervisor ("subordinate-on-supervisor").[2] This method of analysis largely tracks the one for coworker-on-coworker harassment but exempts liability for the employer if the supervisor failed to put a stop to the harassment. *See Lyles v. Dist. of Columbia*, 17 F. Supp. 3d 59, 70 (D.D.C. 2014).[3] The *Lyles* court provided the following standard: "An employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action; but an employer will not be liable for the sexual

---

[2] Curiously, Defendant's briefing omits any mention of employer liability in the context of coworker-on-coworker harassment, even though it is clearly established law that an employer may be liable when "the harassing employee is the victim's co-worker" if the employer "was negligent in controlling working conditions." *Vance*, 570 U.S. at 424. Defendant argues that Plaintiff, or any person so similarly situated, is afforded no legal remedy by nature of his position as a supervisor. *See* ECF No. 19 at 5 ("Title VII is designed to protect subordinates from supervisors, not the other way around."); *see also id.* at 6 ("Plaintiff indisputably enjoyed a supervisory position vis-à-vis Ms. McGlaughlin, which means that Defendant cannot be liable for any purported claim that Plaintiff was harassed by Ms. McGlaughlin."). As the court stated in *Lyles v. Dist. of Columbia*, "[n]o court has ever held that, as a matter of law, an employer cannot be liable for a subordinate's harassment of his or her supervisor." 17 F. Supp. 3d 59, 70 n.7. Defendant's briefing contains no authority to the contrary. *But see id.* at 70 (acknowledging that the Supreme Court has not "had occasion to decide whether an employer can be vicariously liable when a subordinate employee sexually harasses his or her supervisor.").

[3] Not every district court that has encountered this fact pattern has adopted this standard from *Lyles. See Madsen v. City of Phoenix*, 635 F. Supp. 3d 772, 784 (D. Ariz. 2022) (applying coworker-on-coworker standard in case involving subordinate's alleged harassment of supervisor). It does appear, however, that the *Madsen* court based this decision largely on Ninth Circuit case law. *See id.* (stating Ninth Circuit had previously rejected similar argument "because Title VII does not distinguish between supervisors and other employees, and consequently the plaintiff was 'as entitled as any other employee to the protections of Title VII.'" (quoting *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005))). The Court is unable to locate, nor have the parties cited, any relevant Third Circuit caselaw as to this point.

harassment of a supervisor by a subordinate where the supervisor-plaintiff had the ability to stop the harassment and failed to do so." *Id.*; *see also McCowan v. City of Phila.*, Civ. A. No. 19-3326-KSM, 2022 WL 742687, at *29 (E.D. Pa. Mar. 10, 2022) (applying the *Lyles* standard for subordinate-supervisor harassment).

The *Lyles* court identified several ways by which the supervisor-plaintiff could have had the ability to put a stop to the harassment including: "reporting the harassment to the supervisor's own supervisor . . . doing something to 'effect a significant change in employment status' of the harasser, or reprimanding the employee." *Lyles*, 17 F. Supp. 3d at 70 n.8 (quoting *Vance*, 570 U.S. at 431.

This fact pattern is fairly rare.[4] Employing this standard "empowers the supervisor to remove or reprimand the subordinate-harasser, while ensuring that if the supervisor is unable to address the harassment and reports the subordinate-harasser to her supervisors, *i.e.*, takes action to stop the harassment, and it is unsuccessful or the employer resists such actions, the employer will still be liable for allowing the hostile work environment to persist despite being on notice of the problem." *Id.* (citing cases adopting a "similar standard"). [5]

The Court will employ the *Lyles* standard here, as Plaintiff qualifies as Ms. McGlaughlin's supervisor. Plaintiff testified that, as the General Manager of the dealership, he oversaw all of the

---

[4] *See Lyles*, 17 F. Supp. 3d at 70 n.6 ("[V]ery few courts have *ever* been faced with this issue." (citing Ann Carey Juliano, *Harassing Women with Power: The Case of Including Contra-Power Harassment Within Title VII*, 87 B.U.L. REV. 491, 516-23 (2007))).

[5] The Court is also greatly persuaded by the *Lyles* standard's usage and application by the Court's colleague in *McCowan v. City of Philadelphia*, Civ. A. No. 19-3326-KSM, 2022 WL 742687, at *29 (E.D. Pa. Mar. 10, 2022) ("Because [plaintiff] was [alleged harasser's] supervisor at the time of his harassing conduct, the City will be liable only if: (1) it knew or should have known of the harassment and failed to implement prompt and appropriate action, and (2) [Plaintiff] was unable to stop the harassment—by, for example, reporting the harassment to her supervisor or reprimanding [alleged harasser]." (quoting *Lyles*, 17 F. Supp. 3d at 70)).

employees at the dealership. *See* ECF 19-5 at 100:4-10. Moreover, in this position he had the ability to initiate the process to have an employee terminated or issue a formal disciplinary notice to an employee. *See id.* at 17:19-18:9. Plaintiff previously issued a formal disciplinary notice to Ms. McGlaughlin over tardiness. *See id.* at 18:14-19. Plaintiff had to go through and work with the Human Resources Department to issue such a disciplinary notice. *See id.* at 20:6-12.

The *Lyles* standard is appropriate here because Plaintiff's deposition testimony indicates that his position allowed him to attempt to take actions to stop the harassment as is required in the second prong of the analysis. Through his position, he had the ability to "do[ ] something to effect a 'significant change in employment status,' of the harasser, such as firing, or reprimanding the employee." *See Lyles*, 17 F. Supp. 3d at 70 (quoting *Vance*, 133 U.S. at 431). While he had to consult with the Defendant's Human Resources Department, he testified that he was able to initiate such actions and could refer subordinate employees for termination or discipline. *See* ECF No. 19-5 at 17:19-18:9.

The question is now whether there are genuine issues of material fact so as to foreclose summary judgment. The Court determines that there are, and this claim may proceed to trial. Plaintiff has presented sufficient evidence to raise issues of fact so that a reasonable jury could find (1) that Defendant was aware of the harassment and failed to take prompt action to stop it, and (2) Plaintiff took actions attempting to stop the harassment but was unsuccessful. The first prong is the same standard as coworker-on-coworker harassment. *See Lyles*, 17 F. Supp. 3d at 70 (characterizing the second prong as an "exception" to the coworker-on-coworker standard). Here, Plaintiff has put forth evidence that he notified Mr. Egge, Defendant's Regional Vice President and Plaintiff's supervisor, that he was receiving "crazy sexual messages" from Ms. McLaughlin. *See* ECF No. 19-5 at 35:8-10. Plaintiff testified that Mr. Egge told him in response that he did not

want to be involved. *See id.* at 27:6-13 ("I just remember [Mr. Egge] saying, ah, I don't want to see that. I don't want anything to do with that. . . I told you she was trouble."). Because Mr. Egge was a management-level employee, a jury may find Defendant liable based on Mr. Egge's "actual or constructive knowledge about the existence of a sexually hostile environment." *Huston*, 568 F.3d at 105.

As to the second part of this inquiry, a reasonable juror could find that Plaintiff attempted to stop the harassment by reporting the sexually-charged texts to Mr. Egge, but that he was unsuccessful in his attempt. In *Lyles*, the court indicated that an attempt to stop the employment may include "reporting the harassment to the supervisor's own supervisor." 65 F. Supp. 3d 181 at n.4. Here, Plaintiff claims that Mr. Egge was his supervisor. *See* ECF 20-1 at ¶ 17. Given that there is sufficient evidence presented for both of these prongs, and drawing every reasonable evidence in favor of Plaintiff, the Court will deny Defendant's Motion for Summary Judgment as to this claim. At trial, Defendant may argue as to the extent of Plaintiff's attempts to stop the harassment, but because there is evidence that he did attempt to report it to his supervisor, Plaintiff has sufficiently put forth enough evidence to foreclose summary judgment as to this point.

## ii.    Title VII – Race & Gender Discrimination – 42 U.S.C. § 2000e-2(a)(1)

Next, in Counts II and III of his Complaint, Plaintiff brings claims of gender discrimination and race and color discrimination, respectively, under Title VII. Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff asserts his discrimination claims under the pretext theory and the mixed-motive theory. *See Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 592

(E.D. Pa. 2020) ("At this stage of the litigation, plaintiff need not select which of the two theories to pursue." (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1098 (3d Cir. 1995))).

### a. *McDonnell Douglas* Pretext Framework

When analyzing a Title VII discrimination claim under the pretext theory, the Court uses the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff "bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). Then, if this *prima facie* case has been established, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 82). If the defendant can show this, the burden of persuasion switches again, as "the presumption of discriminatory action raised by the *prima facie* case is rebutted." *Id.* The plaintiff then, again, "must established by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." *Id.*

Again, this framework begins with the plaintiff's requirement to show the elements of a *prima facie* case of discrimination: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position he or she sought to attain or retain; (3) the plaintiff suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). Defendant argues that Plaintiff has failed to establish the third and fourth element, and therefore cannot make out a *prima facie* case.

### i. Adverse Employment Action

First, Defendant argues that Plaintiff cannot satisfy the third element and show that he suffered an adverse employment action. The Court disagrees. Plaintiff has put forth enough evidence that a jury could find that Plaintiff was subject to an adverse employment action by Defendant, and accordingly he has adequately met this element of the *prima facie* discrimination claim for the purposes of surviving Defendant's Motion for Summary Judgment.

"[A]n adverse employment action means simply that the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic." *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024)). "[A]n employee need not demonstrate that the asserted adverse employment action was a 'serious and tangible' employment-related harm." *Id.* In *Muldrow*, the Supreme Court examined adverse employment actions in the context of transfers. The Court held that "[t]o make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment. What the transferee does not have to show, according to the relevant text, is that the harm incurred was 'significant.'" *Muldrow*, 601 U.S. at 354-55; *see also Peifer*, 106 F.4th at 270 ("[T]he Court rejected that the harm must be 'serious,' 'significant,' 'substantial,' or 'any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.'" (quoting *Muldrow*, 601 U.S. at 305)).

Here, Defendant argues that Plaintiff did not suffer an adverse employment action because, while he was removed from his role as general manager of the dealership, Defendant claims it wanted to discuss keeping Plaintiff employed in another capacity. *See* ECF No. 19-3 at ¶ 20. Defendant claims that Plaintiff would not engage in such a conversation. *See id.* at ¶ 21. Plaintiff,

on the other hand, claims that he asked whether any change in his role would leave him in the same financial position and that Defendant's Chief Operating Officer refused to answer this question. *See* ECF No. 20-1 at ¶ 20.[6] A reasonable jury could find that such a transfer with a change in his compensation structure or financial situation with the company qualifies as a harm so to constitute an adverse employment action. Accordingly the Court rejects Defendant's argument that Plaintiff's discrimination claim fails as a matter of law for lack of an adverse employment action.

### ii. Inference of Discriminatory Motive

Next, Defendant argues that Plaintiff has failed to show any circumstances that would give rise to an inference of discriminatory motive. *See* ECF No. 19 at 7. This inference "could be supported in a number of ways, including, but not limited to, (1) comparator evidence, (2) evidence of similar racial discrimination of other employees, or (3) direct discrimination from statements or actions by her supervisors suggesting racial animus." *Jarmon v. Trader Joe's Co.*, 660 F. Supp. 3d 357, 363 (E.D. Pa. 2023) (quoting *Golod v. Bank of Am. Corp.*, 405 F. App'x 699, 703 n.2 (3d Cir. 2010)).

Plaintiff argues he meets this element because he can show comparator evidence that provides an inference of discrimination. Specifically, he argues that Ms. McLaughlin—a white woman—was treated more favorably than him—a black man—even though they accused each other of similar misconduct and were subject to the same employment policies. *See* ECF No. 20 at 12-13.

---

[6] This evidence is coupled with Defendant's representation on its appeal of Plaintiff's claim for unemployment compensation which stated that "[Plaintiff] was *terminated* due to a policy violation." *See* Pl.'s Ex. D at ECF No. 20-6 (emphasis added). The remainder of the Defendant's stated reasoning for the appeal is consistent with Defendant's argument in its briefing—that Defendant wanted to potentially engage Plaintiff in another employment opportunity, but Plaintiff refused to participate in such discussions. *See id.* This lends to the genuine issues of material fact that are ripe for a jury's adjudication.

"A similarly situated employee does not need to be identically situated, but the comparator must be similar to plaintiff in 'all relevant respects.'" *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014). Factors relevant to the analysis are whether the employees dealt with the same supervisor, were subject to the same standards, shared job responsibilities, and the nature of the misconduct. *Id.* at 526; *see also Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) ("Which factors are relevant is determined by the context of each case, but often includes a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") This is typically a question of fact for the jury, and "summary judgment is appropriate where there is *no evidence* from which a jury could conclude the parties were similarly situated." *Abdul-Latif*, 990 F. Supp. 2d at 525. (emphasis added).

"[W]hile 'similarly situated' does not mean identically situated, purported comparators must have committed offenses of 'comparable seriousness.'" *Opsatnik*, 335 F. App'x at 223 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)). Here, the Court acknowledges that it is a rather close call as to whether there is enough evidence in the record that a reasonable jury could conclude that Plaintiff and Ms. McGlaughlin were similarly situated. Ultimately, looking at the evidence in the light most favorable to Plaintiff, the Court determines there is, and the Court will defer to the jury's determination. Plaintiff and Ms. McGlaughlin were subject to the same employment policies, *see* ECF No. 20-5 at 73:8-74:5, and subject to the supervision, and investigation, by the same Human Resources Department. *See* ECF No. 20-5 at 8:18-20. Also, they accused each other of similar misconduct. *See* ECF No. 20-1 at ¶ 48. However, Plaintiff claims that only he faced any consequences. *See id.* at ¶¶ 41, 54-55, 59-60.

Defendant may certainly argue to a jury that Plaintiff and his alleged comparator, Ms. McGlaughlin, were not similarly situated by nature of Plaintiff's supervisory position—they had different job responsibilities and ultimately reported to different supervisors. However, under the facts, as alleged, the Court finds that a reasonable jury could find that the employees were similarly situated as to the relevant factors as they pertain to *this case*. The core of the dispute here is Defendant's alleged reaction to the cross-accusations of misconduct by Plaintiff and Ms. McGlaughlin. *See* ECF No. 20-1 at ¶ 48. Ms. McGlaughlin was not found to have violated any employment policy. *See id.* at ¶¶ 59-60. Likewise, the investigation determined that Plaintiff did not harass Ms. McGlaughlin, *see id.* at ¶ 56, and it could not confirm a relationship between the pair. *See id.* at ¶ 49. Ms. DiFeo also testified at her deposition that she had doubts as to Ms. McGlaughlin's truthfulness during the Human Resources investigation. *See id.* at ¶ 61.

Nevertheless, Plaintiff claims that Ms. McGlaughlin was not disciplined, nor was any adverse employment action taken against her. *See id.* at ¶¶ 41, 54-55. Plaintiff contends only *he* was subject to any adverse employment action stemming from this investigation. Given this comparator evidence, and making every reasonable inference in favor of Plaintiff, the Court determines that Plaintiff has put forth sufficient evidence so that a reasonable jury could determine that there is an inference of discrimination, and that he has made out a *prima facie* case of race and gender discrimination.

### iii.  Legitimate Non-Discriminatory Reason

With Plaintiff putting forth enough evidence so that a reasonable jury could find that he established a prima facie case of discrimination, the burden now shifts to Defendant to put forth a legitimate, non-discriminatory reason for the adverse employment action. The employer has a "'relatively light' burden of production" to "introduc[e] evidence which, taken as true, would

permit a conclusion that there was a nondiscriminatory reason for its employment decision." *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 657 (E.D. Pa. 2018) (quoting *Fuentes*, 32 F.3d 759 763 (3d Cir. 1994)). "The employer need not prove that the proffered reason actually motivated the termination decision, because 'throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* Defendant provides a legitimate, non-discriminatory purpose of Defendant's termination: "he waited too long to report Ms. McGlaughlin's inappropriate messages." *See* ECF No. 19-3 at ¶ 22; *see also* ECF No. 19-1 at 12 ("It was Plaintiff's failure to timely address Ms. McGlaughlin's inappropriate messages that led to Defendant removing him as General Manager of the Allentown Suburu dealership.").

Essentially, Defendant contends that he was separated from his role as general manager of the dealership because he exercised poor judgment in failing to report these messages to Human Resources in a timely manner. Defendant points to the two years that passed between when Plaintiff allegedly informed Mr. Egge of the messages and he went to Ms. DiFeo in the Human Resources Department. *See* ECF No. 19-3 at ¶ 24. Defendant has put forth sufficient evidence, for the purpose of its Motion, to meet this low burden of providing a legitimate, non-discriminatory reason for his termination. *See, e.g., Graham v. Gonzales*, 157 F. App'x 139, 141 (11th Cir. 2005) (finding employee's "poor judgment in the workplace" qualified as a legitimate non-discriminatory reason for adverse employment action); *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008) (agreeing with district court that employee's exercise of poor judgment qualified as a legitimate non-discriminatory reason for her termination).

### iv. Pretext

With Defendant having put forth evidence, which taken as true, would allow a reasonable factfinder that there was a legitimate, nondiscriminatory reason for the adverse employment action, the burden, again shifts to Plaintiff, "to show by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Terrell*, 320 F. Supp. 3d at 658. "To meet this burden, a plaintiff must identify evidence from which a reasonable jury could either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (citing *Fuentes*, 32 F.3d at 764).

In presenting evidence that would allow a jury to disbelieve the employer's reason, "Plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason [ ] for its action that a reasonable factfinder *could* rationally find it unworthy of credence." *Id.* If he can do so, he "need not adduce any evidence of discrimination beyond her prima facie case to survive summary judgment." *Id.* (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 430 (3d Cir. 2013)). Moreover, Plaintiff may also present evidence that invidious discrimination was more likely than not a motivating or determinative cause of the employer's action.

The Court finds that Plaintiff has put forth sufficient evidence of pretext to survive Defendant's Motion for Summary Judgment and to allow a jury to hear his allegations and make the ultimate determination. Plaintiff argues that Defendant's Human Resources investigation produced inconsistencies that *could* allow a reasonable factfinder to conclude that Defendant's purported reason for his termination was pretextual. Plaintiff argues that the investigation concluded that Ms. McGlaughlin was not harassed by Plaintiff. *See* ECF No. 20-1 at ¶ 56.

Moreover, it found no evidence that Plaintiff ever responded to any of Mr. McGlauglin's messages, *id.* at ¶ 51, nor did it confirm any relationship between the pair. *See id.* at ¶ 49. Plaintiff claims that he informed Ms. DiFeo during her investigation that he received an unwanted kiss from Ms. McGlaughlin on one occasion, *see id.* ¶ 52, and that she attempted to do the same on a second. *See id.* at ¶ 53. Ms. DiFeo indicated that she had doubts as to Ms. McGlaughlin's truthfulness when she met with her during the investigation. *See id.* at ¶ 61. Also, when Plaintiff met with Ms. DiFeo and Mr. Maher, Plaintiff claims that Ms. DiFeo told him "[Y]ou don't know women" and that he "should have taken her out for a drink." *See* Ex. 19-5 at 61:9-13. Plaintiff argues that despite these facts, and despite no finding of purported misconduct across the board *see id.* at ¶¶ 56, 59, 60, he was the only one who suffered an adverse employment action. *See id.* at ¶¶ 41, 54-55, 66.

Also, Defendant's purported reason for the alleged termination—failing to report the sexual messages to management in a timely manner—ignores the fact that he claims to have informed Mr. Egge about them in March 2021, years prior to his termination, but was told by Mr. Egge that he did not want to get involved. *See id.* at ¶ 9. Moreover, while in its brief Defendant's reasoning boils down to disapproving of Plaintiff's judgment by failing to report the messages, *see* ECF No. 19-3 at ¶ 22, Defendant's reasoning on the appeal of Plaintiff's unemployment claim refers to "a policy violation." *See* ECF No. 20-6.[7]

The Court finds that Plaintiff has pointed to enough in the record to foreclose summary judgment as to this point, as a reasonable jury *could* conclude that these inconsistencies may be evidence that Defendant's purported reason for his alleged termination was pretextual. Given the competing narratives in this case, the Court must allow Plaintiff's claim to proceed to a jury to resolve the issues of fact, rather than resolve them itself as a matter of law.

---

[7] Defendant does not reference a violation of its employee policies in its briefing as to this point. *See* ECF No. 19-1 at 7-9.

### b.  Mixed Motive Framework

Next, to bring a Title VII claim under the mixed-motive theory, "a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016) ("[I]n a mixed-motive case, the plaintiff must ultimately prove that [his protected status was a 'motivating factor'" in the employer's adverse employment action). The Plaintiff must show, "using direct or circumstantial evidence, that [his protected status] was a motivating factor in the defendant's employment decisions." *Shamsuddi v. Classic Staffing Servs.*, 509 F. Supp. 3d 327, 335-36 (E.D. Pa. 2020) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003)).

The Court will reserve judgment as to whether Plaintiff may request that the jury be instructed as to the mixed-motive theory. Typically, an employee may "present his case under both theories at trial, provided that the court 'decide whether one or both theories properly apply' prior to instructing the jury." *See Tomaszewski*, 460 F. Supp. 3d at 592 (citing *Starceski*, 54 F.3d at 1098). Accordingly, for now, to the extent Defendant's Motion for Summary Judgment as it pertains to whether Plaintiff's Title VII Discrimination claim may sound in the mixed-motive theory, it is denied without prejudice. The Court will entertain further argument as to whether Plaintiff may instruct the jury as to this theory.

### iii.    Race Discrimination – 42 U.S.C. § 1981

Additionally, in Count V he brings a claim of race discrimination under 42 U.S.C. § 1981. This statute provides "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a); *see also Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) (stating that Section

1981 "affords a federal remedy against discrimination in private employment on the basis of race"). When advancing a claim under a pretext theory, Section 1981 claims "are subject to the same analysis as discrimination claims under Title VII." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017). Thus, because the Court has determined that Plaintiff's Title VII discrimination claim may proceed under the *McDonnell Douglas* burden shifting framework, Plaintiff's Section 1981 claim may proceed under that framework as well.

### i. Mixed Motive

However, there is a difference between how Title VII mixed-motive cases and Section 1981 mixed-motive cases are analyzed. "[I]n mixed-motive cases under § 1981 . . . the plaintiff must produce only direct evidence that race or gender was a motivating factor in the defendant's employment decision." *Tomaszewski*, 460 F. Supp. 3d at 598.

"[I]f the plaintiff shows 'by direct evidence that an illegitimate criterion was a substantial factor in the employment decision,' the burden shifts to the defendant 'to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor." *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 (3d Cir. 2009) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276 (O'Connor, J., concurring)); *see also id.* ("This Court has held that Justice O'Connor's concurring opinion 'represents the holding of the fragmented Court." (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 n.2 (3d Cir. 2002))).

To proceed under this theory, a Plaintiff must "present direct evidence of discrimination." *Id.* at 183. This is "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the plaintiff's race in reaching their decision to fire [him]." *Id.* (quoting *Fakete*, 308 F.3d at 338). Direct evidence "must be strong enough to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the

defendant's decision." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010). Also, "the evidence must be connected to the decision being challenged by the plaintiff." *Id.* ("We have referred to these requirements as creating a 'high hurdle' for plaintiffs." (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d Cir. 1997)).

The primary example of "direct evidence" is "statements of a person involved in the decision making process that reflects a discriminatory or retaliatory animus of the type complained of in the suit, even if the statements are not made at the same time as the adverse employment decision, and thus constitute only circumstantial evidence that an impermissible motive substantially motivated the decision." *Id.* (quoting *Fakete*, 308 F.3d at 339). Plaintiff has failed to provide such direct evidence of racial discrimination, and thus he will not be permitted to proceed on his Section 1981 claim on the mixed-motive theory. Defendant's Motion for Summary Judgment is granted to the extent that it seeks to prevent Plaintiff from proceeding on his Section 1981 claim under a mixed-motive theory.

### iv.    Title VII – Retaliation - 42 U.S.C. § 2000e-3(a)

The final claim in Plaintiff's Complaint alleges retaliation under Title VII. The statute relevantly provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To make out a prima facie case of retaliation, a plaintiff must show: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *See Moore v. City of Phila.*, 461 F.3d 340-41 (3d Cir.

2006) (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). Title VII retaliation claims are analyzed under the *McDonell Douglas* burden shifting framework. *See Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410, 425 (E.D. Pa. 2023).

An employee engages in a protected activity when he (1) participates in Title VII proceedings or he (2) opposes what an employee reasonably believes to be conduct that is unlawful under Title VII. *Id.* (citing *Moore*, 461 F.3d at 341). A formal complaint is not required, however, and "[o]pposing an employer's activities includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management." *Id.* (citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)). "[W]hen an employee communicates *to [his] employer* a belief that the employer has engaged in … a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Id.* (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)) (emphasis included).

Moreover, as to the third element, pertaining to causation, Plaintiff is correct that the temporal proximity of the report and the alleged adverse employment action may provide an inference of retaliation at this stage in the litigation. *See LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 232 (3d Cir. 2007) ("Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment."); *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (stating that "although there is no bright line rule as to what constitutes unduly suggestive temporal proximity," seven days was "in the realm of what this Court and others have found sufficient at the prima facie stage").

Plaintiff has put forth sufficient evidence to allow his Title VII retaliation claim to proceed to the jury. First, Plaintiff can show that he engaged in a protected activity by complaining to Defendant's Human Resources Department about the rumor he heard regarding him and Ms. McGlaughlin. *See E.E.O.C. v. Avecia, Inc.*, 151 F. App'x 162, 164 (3d Cir. 2005) (finding that complaints of hostile work environment "clearly" satisfied first element of Title VII of retaliation claim); *see also Smith v. RB Distribution, Inc.*, 498 F. Supp. 3d 645, 662 (E.D. Pa. 2020) ("The Third Circuit has held that formal and informal complaints of discrimination, which includes harassment, constitute protected activities." (citing *Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2011))). Second, as the Court previously analyzed, Plaintiff has put forth sufficient evidence that he has suffered an adverse employment action to overcome Defendant's Motion. Third, and finally, the week between the report to Human Resources and the purported adverse employment action is "in the realm" of what other courts have determined to be "unduly suggestive temporal proximity" so to satisfy this element at the prima facie stage. *See Lichtenstein*, 691 F.3d at 302. Accordingly, Plaintiff has put forth sufficient evidence to overcome Defendant's Motion for Summary Judgment on his Title VII retaliation claim.[8]

## V.    CONCLUSION

This case, like many employment discrimination cases, is rife with factual disputes that

---

[8] The Court will not duplicate its analysis of the remainder of the *McDonnell Douglas* burden-shifting analysis, as it has already determined that Plaintiff has put forth sufficient evidence of pretext to survive Defendant's Motion. Nevertheless, a jury's analysis of this claim will proceed under that framework.

require a jury's determination. For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. An appropriate order follows.


BY THE COURT:


*/s/ John M. Gallagher*

JOHN M. GALLAGHER
United States District Court Judge